Isaac Derek Zorea
Law Offices of Isaac Derek Zorea
P.O. Box 90844
Anchorage, AK 99509
Phone: (907) 830-1385
Fax: (800) 536-1071
*izorea.law@gmail.com*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| CARTER DANIELS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No.: _____ |
| | ) |
| THE KLONDIKE GROUP, INC., | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

## **COMPLAINT AND DEMAND FOR JURY TRIAL**

COMES NOW, Carter Daniels, the plaintiff above named, by and through his attorney,

Isaac Derek Zorea, and complains as follows:

## I. **PARTIES**

1.1. Plaintiff Carter Daniels is a natural person born on September 26, 2002, who

resided in Annandale, Virginia at all times relevant to this action. At all relevant times, Plaintiff

was a qualified individual with a disability within the meaning of the Americans with

Disabilities Act, 42 U.S.C. § 12111(8), and a person with a disability within the meaning of the

Alaska Human Rights Act, AS 18.80.220.

1.2.     Defendant The Klondike Group, Inc. is a corporation organized and existing under the laws of the State of Indiana, with its principal place of business located at 2667 Mt. Vernon Avenue, Evansville, Indiana 47712. Defendant operates multiple seasonal tourism businesses in Skagway, Alaska, including Richter's Souvenir Gift Shop, Yukon Heath's Popcorn Emporium, Skagway Pizza Parlor, Southeast Tours, and DIY Jeeps. At all relevant times, Defendant employed fifteen (15) or more employees and is an "employer" within the meaning of 42 U.S.C. § 12111(5) and AS 18.80.300(5).

## II.  <u>JURISDICTION AND VENUE</u>

2.1.     This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12117(a), as this action arises under the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101 et seq.

2.2.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as those claims are so related to the federal claims that they form part of the same case or controversy.

2.3.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the unlawful employment practices alleged herein were committed within the District of Alaska and Plaintiff's employment with Defendant was to be performed in Skagway, Alaska.

## III.  <u>ADMINISTRATIVE PREREQUISITES</u>

3.1.     Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Alaska State Commission for Human Rights ("ASCHR"), which was assigned EEOC No. 38A-2025-00073 and ASCHR No. J-25-065.

3.2.    On March 23, 2026, the ASCHR issued a Closing Order dismissing the complaint without prejudice pursuant to AS 18.80.112(a) on the basis that investigation failed to discover substantial evidence of an unlawful discriminatory practice, and simultaneously issued a Notice of Right to Judicial Review.

3.3.    Plaintiff has exhausted all required administrative remedies. This Complaint is timely filed within the applicable limitations period following issuance of the right-to-sue notice.

## IV.  FACTS

### A.    PLAINTIFF'S DISABILITY

4.1.    Plaintiff Carter Daniels has been diagnosed with Autism Spectrum Disorder ("ASD"), a permanent, lifelong neurodevelopmental condition. ASD substantially limits Plaintiff in major life activities including, but not limited to, social communication, verbal and nonverbal communication, sensory processing, and neurological function.

4.2.    Plaintiff's ASD manifests itself in his speech and mannerisms; he sometimes stutters, does not always maintain eye contact, and exhibits characteristic patterns in the way he walks, talks, and moves.

4.3.    Plaintiff was diagnosed with autism when he was young. He is socially awkward but has worked very hard to try to lead a normal life. He graduated from high school in 2020 and has completed almost four semesters of college.

4.4.    Plaintiff did not disclose his disability during the hiring process, after his employment began, or at the time his employment was terminated, because he was afraid of discrimination.

Case 1:26-cv-00013-HRH    Document 1    Filed 06/04/26    Page 3 of 14

**B.** <u>THE EMPLOYMENT OFFER AND PROMISES MADE BY DEFENDANT</u>

4.5.     On or about April 12, 2025, Defendant's Human Resources representative Sheryl Stratton contacted Plaintiff to invite him to interview for a Popcorn Cook position with The Klondike Group.

4.6.     At the time of the interview, the popcorn cook position was not available. However, because Plaintiff had retail experience on his resume, Defendant's Human Resources Director discussed with Plaintiff the open Warehouse Support Specialist position and explained the job duties. Plaintiff responded that he didn't think he would have a problem with the position.

4.7.     On April 21, 2025, Defendant, through its Senior Vice President Tyler Rose, issued Plaintiff a written Employment Offer for the position of Warehouse Support Specialist in Skagway, Alaska. The offer letter expressly stated the following material terms:

(a)  "Your work start date will commence on May 1, 2025, and terminate on October 15, 2025."

(b)  "We want to offer you a wage of $16.00 per hour (paid bi-weekly)."

(c)  "This offer is for a full-time seasonal position, with the expectation of added hours during peak periods of the season."

4.8.     The Employment Commitment and Receipt of Information section of the offer, which Plaintiff signed, stated: "I understand that once I sign my offer letter, I will be officially hired by The Klondike Group for the dates noted in the Employment Agreement."

4.9.     Defendant's General Information Sheet, provided to Plaintiff as part of the hiring packet, expressly stated: "All seasonal positions require an orientation and training period. If, during this time, management determines that you may be better suited for another position, we may offer an alternate role."

4.10.    The offer documents stated: "Don't wait to plan your trip and secure reservations to Alaska! Flights & Ferries are limited and book quickly due to the large influx of seasonal workers." Defendant provided Plaintiff with specific transportation information including airline carriers, ferry systems, and seaplane services to reach Skagway, Alaska.

4.11.    On April 23, 2025, Defendant's Human Resources representative Sheryl Stratton followed up with Plaintiff requesting his travel itinerary, confirming her awareness that Plaintiff was making concrete travel plans in reliance on the offer. Plaintiff responded that his seaplane flight was expected to arrive at Skagway Airport at 3:10 PM on Tuesday, April 29, and forwarded his booking confirmations to Defendant.

4.12.    Plaintiff was required to pay a $200 housing security deposit as a condition of securing company housing.

4.13.    The Employee Housing Agreement provided that Plaintiff's housing was contingent upon employment and that upon termination, Plaintiff would be required to vacate the housing within 24 hours of employer notification.

C.    PLAINTIFF'S RELOCATION IN RELIANCE ON DEFENDANT'S PROMISES

4.14.    In direct reliance on Defendant's written employment offer, the promised orientation and training period, and Defendant's express encouragement to book travel immediately, Plaintiff relocated from Annandale, Virginia to Skagway, Alaska.

4.15.    Plaintiff departed for Alaska on April 29, 2025. He and his family incurred the following inbound travel expenses: flight to Juneau, $683; seaplane to Skagway, $224; luggage fees, $55; for a total inbound travel cost of $962.

4.16.    By relocating to Alaska, Plaintiff abandoned his Virginia-based employment opportunities for the entire summer and fall 2025 season.

**D.** **PLAINTIFF'S EMPLOYMENT AND TERMINATION**

4.17.    Plaintiff began work as a Warehouse Support Specialist on May 1, 2025, as required by the offer letter.

4.18.    Plaintiff received no orientation or training whatsoever upon commencing work, despite Defendant's written promise that all seasonal positions require an orientation and training period.

4.19.    Plaintiff testified that he was able to perform all the job duties that he was asked to perform, and that he was not informed of any problems with his work performance until his employment was terminated. Plaintiff believed he asked the Supervisor how he did after the first day of work and that she told him he was doing a good job.

4.20.    The Supervisor's own testimony confirmed that Plaintiff was eventually able to complete all the tasks she assigned.

4.21.    Defendant did not document any alleged performance issues. Witnesses explained that they do not always document work performance due to the "seasonal" nature of most employees and the small size of the company.

4.22.    Plaintiff's employment was terminated after his second day of work. The HR representative who terminated Plaintiff's employment provided no specific justification beyond stating "it's not working out" and "it's not a good fit."

4.23.    The Supervisor reported that in the two years she had been working as Defendant's Warehouse Manager, Defendant had not found an employee suitable for the warehouse assistant position, and she had hoped that Defendant had found a suitable person in Plaintiff. The Supervisor testified that if Plaintiff could have taken over 10% of her job duties it

Case 1:26-cv-00013-HRH    Document 1    Filed 06/04/26    Page 6 of 14

would have made her job easier. After Plaintiff's employment was terminated, the Supervisor worked the entire season alone as no new warehouse assistant was hired.

**E.     THE SUPERVISOR'S KNOWLEDGE AND PERCEPTION OF PLAINTIFF'S DISABILITY**

4.24.   The Supervisor explained that she assumed right away that Plaintiff was probably autistic, but that was not a problem as long as Plaintiff was willing to work.

4.25.   Plaintiff did not hear any comments about ASD, his personality, or the way he walks, talks, or moves during his employment. No feedback of any kind was provided to Plaintiff prior to termination.

4.26.   Despite the Supervisor's immediate awareness that Plaintiff was likely autistic, Defendant made no effort to: (a) confirm or inquire about Plaintiff's disability status; (b) provide the promised orientation and training period; (c) initiate any interactive process to identify accommodations; (d) provide Plaintiff with any written or oral performance feedback prior to termination; or (e) consider reassignment to another available position in Defendant's multiple business operations.

**F.     DAMAGES**

4.27.   Upon termination, Plaintiff was required to vacate company housing within 24 hours of employer notification per the Employee Housing Agreement.

4.28.   Defendant required Plaintiff to leave the company housing within three days and provided no assistance for his return travel. The demand to leave almost immediately left Plaintiff no time to plan or arrange less expensive travel options.

4.29.   Plaintiff incurred the following return travel expenses: ferry to Juneau, $64; overnight stay in Juneau, $110; flight to Seattle, $308; flight to Washington, D.C., $420; for a total return travel cost of $902, and total combined travel expenses of $1,864.

4.30.   Plaintiff's earnings for the two half-days worked were completely offset by the charge for one week of company housing, leaving him with no compensation for time actually worked.

4.31.   By reason of Defendant's conduct, Plaintiff has lost wages equal to the remainder of the contracted employment term, approximately 24 weeks at 35-40 hours per week at $16.00 per hour, totaling approximately $13,440 to $15,360 in lost wages, in addition to the $1,864 in travel expenses and the $200 housing deposit.

4.32.   Plaintiff suffered and continues to suffer emotional distress, humiliation, loss of dignity, and harm to his professional and personal confidence as a direct and proximate result of Defendant's conduct.

**CAUSES OF ACTION**

**COUNT I:   DISABILITY DISCRIMINATION UNDER THE AMERICANS WITH DISABILITIES ACT: "REGARDED AS" HAVING A DISABILITY 42 U.S.C. §§ 12102(1)(C), 12102(3)(A), 12112(a)**

5.1.   Plaintiff Carter Daniels incorporates all the facts and allegations within the paragraphs listed above, 4.1 through 4.32.

5.2.   The ADA prohibits covered employers from discriminating against a qualified individual on the basis of disability in regard to discharge of employees. 42 U.S.C. § 12112(a).

5.3.   The ADA defines "disability" to include "being regarded as having" a physical or mental impairment. 42 U.S.C. § 12102(1)(C). Under the ADA Amendments Act of 2008, an individual meets this standard if he has been subjected to an action prohibited under the ADA because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity. 42 U.S.C. § 12102(3)(A). Autism Spectrum Disorder is a permanent, lifelong neurological condition and is neither transitory nor minor.

Case 1:26-cv-00013-HRH     Document 1     Filed 06/04/26     Page 8 of 14

5.4. Plaintiff Carter Daniels affirms and attests that during the relevant time of his employment with Defendant, he was satisfactorily performing the key elements of his job. The Supervisor's own testimony confirmed that Plaintiff was eventually able to complete all the tasks she assigned. With the promised orientation and training, and with minimal accommodations appropriate to his disability, Plaintiff was capable of performing the essential functions of the Warehouse Support Specialist position.

5.5. Defendant's Supervisor admitted that upon first observing Plaintiff, she assumed right away that Plaintiff was probably autistic. This immediate assumption, formed upon observing Plaintiff's ASD-related characteristics, including his speech, eye contact, gait, and physical mannerisms, constitutes perception of an actual or perceived mental impairment within the meaning of 42 U.S.C. § 12102(3)(A).

5.6. The adverse employment action, termination, was taken by the very decision-maker who perceived Plaintiff as autistic, within two half-days of Plaintiff's first appearance at the workplace. The temporal proximity between the Supervisor's perception of Plaintiff's disability and the termination decision supports a direct inference of causation.

5.7. Defendant's stated reasons for termination, "it's not working out" and "it's not a good fit," are vague and unsupported by any documentation. Defendant did not document any alleged performance issues. The promise of an orientation and training period was never honored. No written or oral performance feedback was provided prior to termination. No progressive discipline was applied.

5.8. Plaintiff Carter Daniels affirms and attests that Defendant's conduct, as alleged in paragraphs 5.1 through 5.7, constituted a willful and/or reckless violation of the duty that it owed

to him and violated Plaintiff's federally protected rights under the Americans with Disabilities Act, as amended.

5.9. As a remedy for the conduct perpetrated by Defendant The Klondike Group, Inc., Plaintiff Carter Daniels requests all available remedies, including lost wages, compensatory damages for emotional distress, punitive damages pursuant to 42 U.S.C. § 1981a, attorney fees, prejudgment interest, and other remedies available under the ADA related to disability discrimination.

**COUNT II: DISABILITY DISCRIMINATION UNDER THE ALASKA HUMAN RIGHTS ACT** (AS 18.80.220)

6.1. Plaintiff Carter Daniels incorporates all the facts and allegations within the paragraphs listed above, 4.1 through 4.32.

6.2. The Alaska Human Rights Act, AS 18.80.220, makes it unlawful for employers to discriminate against persons based on physical or mental disability when the reasonable demands of the position do not require distinction, and courts have interpreted this to include an implied duty to reasonably accommodate disabled employees.

6.3. Plaintiff has ASD, a mental disability as defined under AS 18.80.300(14). Plaintiff is a "person with a disability" entitled to the protections of the Alaska Human Rights Act.

6.4. Plaintiff Carter Daniels affirms and attests that during the relevant time of his employment he was satisfactorily performing the key elements of his job. The reasonable demands of the Warehouse Support Specialist position did not require any distinction based on Plaintiff's disability, and Plaintiff was capable of performing the essential functions of the position with minimal accommodations.

Case 1:26-cv-00013-HRH    Document 1    Filed 06/04/26    Page 10 of 14

6.5.	Defendant's Supervisor perceived Plaintiff as autistic from the moment she first observed him. Despite this perception, Defendant terminated Plaintiff's employment after two half-days with no documentation of performance issues, no performance feedback prior to termination, no orientation or training as promised, and no attempt to accommodate or explore whether Plaintiff's perceived disability was contributing to any performance concerns.

6.6.	Plaintiff's perceived disability was a motivating factor in Defendant's decision to terminate his employment. The Supervisor's immediate assumption of autism, combined with the rapid termination and complete failure to engage in any accommodation process, gives rise to an inference of discriminatory motivation sufficient to establish liability under AS 18.80.220.

6.7.	Plaintiff Carter Daniels affirms and attests that Defendant's conduct, as alleged in paragraphs 6.1 through 6.6, constituted a willful and/or reckless violation of the duty it owed to him, violated its own internal policies and public policy, and constituted unlawful disability discrimination in violation of the Alaska Human Rights Act.

6.8.	As a remedy for the conduct perpetrated by Defendant The Klondike Group, Inc., Plaintiff Carter Daniels requests all available remedies under AS 22.10.020(i), including back pay, front pay, compensatory damages for emotional distress, injunctive relief requiring Defendant to implement disability non-discrimination policies and training, attorney fees, and other remedies available under the Alaska Human Rights Act.

## COUNT III: <u>PROMISSORY ESTOPPEL</u>

7.1.	Plaintiff Carter Daniels incorporates all the facts and allegations within the paragraphs listed above, 4.1 through 4.32.

7.2.	Defendant made the following actual, specific, written promises upon which Plaintiff was intended to, and did, rely: (a) that Plaintiff's employment would commence May 1,

2025 and terminate October 15, 2025, at a wage of $16.00 per hour for a full-time seasonal position; (b) that all seasonal positions require an orientation and training period; and (c) that once Plaintiff signed his offer letter, he would be officially hired by The Klondike Group for the dates noted in the Employment Agreement.

7.3. Defendant did not merely extend an offer of employment; it actively directed and encouraged Plaintiff's cross-country relocation. The offer documents stated: "Don't wait to plan your trip and secure reservations to Alaska! Flights & Ferries are limited and book quickly due to the large influx of seasonal workers." Defendant provided specific travel information, including airline carriers, ferry routes, and seaplane services, for reaching Skagway from the continental United States. Defendant's HR representative subsequently requested Plaintiff's travel itinerary, confirming awareness that Plaintiff had booked and was relying on specific travel arrangements. Defendant fully and specifically foresaw that Plaintiff, a Virginia resident, would relocate cross-country in reliance on its promises.

7.4. In direct reliance on Defendant's promises, Plaintiff departed Annandale, Virginia on or about April 29, 2025, and relocated to Skagway, Alaska; incurred inbound travel expenses of $962 (flight to Juneau $683, seaplane to Skagway $224, luggage fees $55); paid a $200 housing security deposit required by Defendant; incurred return travel expenses of $902 (ferry $64, overnight lodging $110, flights totaling $728) for combined travel costs of $1,864; and abandoned Virginia employment opportunities for the entire May through October 2025 season. These constitute a substantial change of position in reliance on Defendant's promises.

7.5. Defendant induced Plaintiff to travel cross-country, incur $1,864 in documented travel expenses, pay a $200 housing deposit, and forfeit an entire season's worth of other employment, and then terminated him after two half-days without honoring its express promise

of an orientation and training period, without providing any performance feedback, and without cause. Upon termination, Plaintiff was required to vacate company housing within 24 hours, leaving him no time to arrange less expensive return travel. Enforcement of Defendant's promises is necessary in the interest of justice.

7.6. As a direct and proximate result of Defendant's failure to honor its promises, Plaintiff has suffered damages including lost wages for the full contract term (May 1 to October 15, 2025) of approximately $13,440 to $15,360, travel expenses of $1,864, the $200 housing deposit, and other consequential damages in amounts to be proven at trial.

## JURY DEMAND

8.1. Plaintiff Carter Daniels hereby demands a trial by jury on all claims and issues for which he has a right for a jury to render judgment, pursuant to Federal Rule of Civil Procedure 38(b).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Carter Daniels requests judgment against Defendant The Klondike Group, Inc. as follows:

1. On Counts I and II, a declaration that Defendant's actions violated the Americans with Disabilities Act, as amended, and the Alaska Human Rights Act, AS 18.80.220.

2. Full and complete payment of all damages to Plaintiff against Defendant related to its violation of the Americans with Disabilities Act and the Alaska Human Rights Act, including back pay, lost wages, future wages, compensatory damages for emotional distress, punitive damages, attorney fees, prejudgment interest, and other permitted remedies, with the exact amount to be proven at trial.

3. Plaintiff Carter Daniels requests reinstatement to his job for which he had been unlawfully terminated, or, if the workplace has become impermissibly hostile, future damages going forward to his expected date of completion of the contracted employment term.

4. On Count I, punitive damages pursuant to 42 U.S.C. § 1981a based on Defendant's willful and reckless disregard of Plaintiff's federally protected rights.

5. On Count II, injunctive relief requiring Defendant to implement and maintain adequate disability non-discrimination policies and training for all supervisory personnel.

6. On Count III, damages in an amount equal to the full value of the promised employment term and all relocation expenses incurred in reasonable reliance on Defendant's promises, including travel costs of $1,864, the $200 housing deposit, and lost wages for the contracted employment term, in amounts to be proven at trial.

7. An award of reasonable attorney fees and costs pursuant to 42 U.S.C. § 12205, AS 18.80.120, and any other applicable provision.

8. Pre-judgment and post-judgment interest at the maximum lawful rate.

9. Plaintiff Carter Daniels requests whatever additional damages and relief the Court considers appropriate to award given the severity of Defendant's conduct.

Dated: June 4, 2026

By: /s/ Isaac D Zorea
Isaac D. Zorea
Alaska Bar No. 0011090
P.O. Box 90844
Anchorage, Alaska 99509
Telephone: (907) 830-1385
Facsimile: (800) 536-1071
Email: izorea.law@gmail.com